# United States Court of Appeals

## For the First Circuit

No. 09-2673

JULIO VÁSQUEZ,

Petitioner,

v.

ERIC H. HOLDER, JR.,
ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Torruella and Stahl, Circuit Judges.

Thomas P. Glynn with whom Allan M. Tow was on brief for petitioner.

Tiffany Walters Kleinert, Trial Attorney, with whom Tony West, Assistant Attorney General, and David V. Bernal, Assistant Director, were on brief for respondent.

February 16, 2011

**STAHL**, <u>Circuit Judge</u>.　Julio Vásquez, a 39-year-old citizen of Guatemala, petitions for review of an order issued by the Board of Immigration Appeals ("BIA").　Vásquez challenges the BIA's conclusion that an expedited removal order interrupted his continuous physical presence in the United States, thereby rendering him ineligible for cancellation of removal pursuant to 8 U.S.C. § 1229b.　Alternatively, Vásquez urges this court to remand for a determination as to whether he was warned about the consequences of an expedited removal order and "given the choice of being turned away."　We deny this petition in part and dismiss it in part for lack of jurisdiction.

## I. Facts & Background

Vásquez entered the United States on April 1, 1992 without being admitted or paroled. After living in the United States for at least several months, Vásquez applied for asylum. His application was never approved, but Vásquez was issued a work authorization card while the application was pending.[1]

In September 1997, after more than five years in the United States, Vásquez returned to Guatemala "to see if things [had] changed . . . after the government signed the peace contract."　On October 22, 1997, Vásquez attempted to re-enter the

---

[1]The record is unclear as to precisely when Vásquez applied for asylum and the time period for which he held a valid work authorization card (though it appears that the card was renewed annually through at least 1997).　These factual details have no material impact on our analysis.

United States at Miami International Airport using a Guatemalan passport that was not his own. Vásquez was stopped by Immigration and Naturalization Service ("INS") officials, and provided a sworn statement in which he admitted to paying $1,000 for the fraudulent document. The INS officials deemed Vásquez inadmissible pursuant to two different statutory provisions. See 8 U.S.C. § 1182(a)(6)(C)(i) ("Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States . . . is inadmissible."); id. § 1182(a)(7)(A)(i)(I) (providing that any noncitizen who does not possess valid entry documentation is inadmissible). As a result, Vásquez was issued an expedited removal order pursuant to 8 U.S.C. § 1225(b)(1) and was removed. Nonetheless, later that same month, Vásquez successfully re-entered the United States (without authorization), where he went on to secure consistent employment and purchase a home.

On September 30, 2006, the Department of Homeland Security ("DHS") commenced formal removal proceedings against Vásquez by serving him with a Notice to Appear ("NTA"). The NTA alleged that Vásquez was subject to removal because he had entered the United States without admission or parole on April 1, 1992. See § 1182(a)(6)(A)(i).

In the proceedings in front of the Immigration Judge ("IJ"), Vásquez conceded that he was removable under § 1182(a)(6)(A)(i), but sought other forms of relief including cancellation of removal pursuant to § 1229b(b)(1) and, in the alternative, voluntary departure. On July 29, 2008, the IJ concluded that Vásquez was ineligible for cancellation of removal. The IJ reasoned that the October 1997 expedited removal order interrupted Vásquez's continuous physical presence in the United States. Consequently, with Vásquez's period of physical presence terminating upon service of the NTA in September 2006, see § 1229b(d)(1), Vásquez lacked the ten years of continuous physical presence required by § 1229b(b)(1). The IJ did, however, grant Vásquez's application for voluntary departure.

On November 27, 2009, the BIA, in an opinion that appears to have been issued by a single member,[2] dismissed Vásquez's appeal and affirmed the IJ's decision. Citing In re Avilez-Nava, 23 I. & N. Dec. 799, 805-06 (BIA 2005) (en banc) and Juarez-Ramos v. Gonzales, 485 F.3d 509 (9th Cir. 2007), the BIA explained, "The [October 1997] expedited removal proceedings constituted a 'formal, documented process pursuant to which the alien was determined to be inadmissible to the United States,' such as would be inconsistent with a continuation of physical presence." As a result, Vásquez

---

[2]BIA decisions are issued by a single member, by a three-member panel, or en banc. See 8 C.F.R. § 1001.3.

-4-

lacked the requisite ten years of continuous physical presence prior to being served with the NTA in September 2006.

## II. Discussion

In cases where the BIA has rendered a decision with its own analysis of the question at issue, our review focuses on the BIA's decision, not the IJ's.[3]  See Pulisir v. Mukasey, 524 F.3d 302, 307-08 (1st Cir. 2008); cf. Jupiter v. Ashcroft, 396 F.3d 487, 490 (1st Cir. 2005) ("Where . . . the BIA has employed its streamlined 'affirmance without opinion' procedure, see 8 C.F.R. § 1003.1(e)(4), we review directly the IJ's decision as if it were the decision of the BIA.").  We review the BIA's conclusions of law de novo "'with appropriate deference to the agency's interpretation of the underlying statute in accordance with administrative law principles.'"  Stroni v. Gonzales, 454 F.3d 82, 87 (1st Cir. 2006) (quoting Gailius v. INS, 147 F.3d 34, 43 (1st Cir. 1998)).

**A.      The Effect of Expedited Removal on Vásquez's Eligibility for Cancellation of Removal**

Because § 1229b is unclear as to whether an expedited removal ends the accrual of continuous physical presence in the United States, and the BIA's resolution of that ambiguity was reasonable, we reject Vásquez's challenge to the determination that

---

[3]That said, in this case, the BIA and the IJ used similar reasoning to arrive at the same result.

a departure via an expedited removal order halts continuous physical presence in the United States.[4]

### 1. Statutory Framework

The Immigration and Nationality Act ("INA") authorizes expedited removal "[i]f an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States . . . is inadmissible under section 1182(a)(6)(C) or 1182(a)(7)." § 1225(b)(1)(A)(i). An expedited removal order precludes admissibility to the United States for five years. § 1182(a)(9)(A)(i). However, an alien subject to expedited removal is <u>not</u> entitled to "further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." <u>Id.</u> The lack of procedural protections accompanying expedited removal stands in contrast to the

---

[4]This court has jurisdiction to review this issue pursuant to 8 U.S.C. § 1252. Notably, § 1252 precludes jurisdiction over "any judgment regarding the granting of relief under section . . . 1229b . . . ." <u>Id.</u> § 1252(a)(2)(B)(i). Nonetheless, we may review the predicate legal question of whether an alien has satisfied the continuous physical presence requirement of § 1229b(b)(1). <u>See</u>, e.g., <u>Ayeni</u> v. <u>Holder</u>, 617 F.3d 67, 70 (1st Cir. 2010) (noting that Congress carved out an exception to § 1252(a)(2)(B)'s jurisdiction-limiting effect: "when a petition for judicial review raises claims premised on either constitutional questions or questions of law" (citing § 1252(a)(2)(D))); <u>Mendez-Reyes</u> v. <u>Att'y Gen. of U.S.</u>, 428 F.3d 187, 189 (3d Cir. 2005) ("This Court generally lacks jurisdiction to review discretionary decisions made under § 1229b . . . . However, under the Real ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, our jurisdiction is expanded to consider 'constitutional claims or questions of law' notwithstanding the jurisdictional limitations of § 1252(a)(2)(B)." (quoting § 1252(a)(2)(D))).

significant process, specified in 8 U.S.C. § 1229a, that is required to effectuate a formal removal. See Juarez-Ramos, 485 F.3d at 511 n.16.

The INA gives the Attorney General discretion to "cancel" removal if the alien:

> (A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application;
>
> (B) has been a person of good moral character during such period;
>
> (C) has not been convicted of an offense under section 1182(a)(2), 1227(a)(2), or 1227(a)(3) of this title, subject to paragraph (5); and
>
> (D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

§ 1229b(b)(1) (emphasis added) ("subpart (b)(1)").[5]

---

[5]Because we conclude that Vásquez failed to maintain ten years of continuous physical presence in the United States, see infra, we need not address whether he would satisfy the other requirements for cancellation of removal under subpart (b)(1).

Although § 1229b does not include a definition of either "continuous" or "physical presence," it does include "special rules" that inform the meaning of those terms:

> Special rules relating to continuous residence or physical presence
>
> (1) Termination of continuous period
>      For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end (A) except in the case of an alien who applies for cancellation of removal under subsection (b)(2) of this section, when the alien is served a notice to appear under section 1229(a) of this title, or (B) when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien inadmissible to the United States under section 1182(a)(2) of this title or removable from the United States under section 1227(a)(2) or 1227(a)(4) of this title, whichever is earliest. [("subpart (d)(1)")]
>
> (2) Treatment of certain breaks in presence
>      An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) of this section if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days. [("subpart (d)(2)")]

Id. § 1229b(d)(1)-(2).

Additionally, the BIA has attempted to clarify what types of events will halt the accrual of continuous physical presence. In In re Romalez-Alcaide, the BIA held that, in addition to the

-8-

departures exceeding a certain duration specified in subpart (d)(2), a departure under threat of deportation also "constitute[s] [a] break[] in the . . . accrual of continuous physical presence for purposes of cancellation of removal."  23 I. & N. Dec. 423, 423-24 (BIA 2002) (en banc).  Later, in In re Avilez-Nava, the BIA reaffirmed its conclusion that § 1229b(d)(2) "'does not purport to be the exclusive rule respecting all departures.'"  23 I. & N. Dec. at 802 (quoting In re Romalez-Alcaide, 23 I. & N. Dec. at 425) (emphasis in original).  The BIA held, however, that a mere refusal to admit at a land border port of entry, without any formal or documented process effectuating that refusal, does not interrupt continuous physical presence.  Id. at 803-06.  Specifically, the BIA explained:

> [W]e hold that an immigration official's refusal to admit an alien at a land border port of entry will not constitute a break in the alien's continuous physical presence, unless there is evidence that the alien was formally excluded or made subject to an order of expedited removal, was offered and accepted the opportunity to withdraw his or her application for admission, or was subjected to any other formal, documented process pursuant to which the alien was determined to be inadmissible to the United States.

Id. at 805-06 (emphasis added).

### 2. The BIA's Interpretation of § 1229b and the Chevron Analysis

Because this case presents us with "questions implicating 'an agency's construction of the statute which it administers,'" we

"[apply] the principles of deference described in <u>Chevron USA Inc.</u> <u>v.</u> <u>Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842 (1984)." <u>See</u> <u>INS</u> v. <u>Aquirre-Aguirre</u>, 526 U.S. 415, 424-25 (1999) (applying <u>Chevron</u> in reviewing a BIA interpretation of a statutory exception to an INA provision mandating the withholding of deportation in certain circumstances);[6] <u>see</u> <u>also</u> <u>Negusie</u> v. <u>Holder</u>, 129 S. Ct. 1159, 1163 (2009) ("It is well settled that principles of <u>Chevron</u> deference are applicable to [the INA]." (internal quotation marks omitted)).  That is, we apply <u>Chevron</u>'s two-step analysis in reviewing the BIA's interpretation of § 1229b.  The first step in this analysis is to "ask[] whether 'the statute is silent or ambiguous with respect to the specific issue' before [this court] . . . ."  <u>Aquirre-Aguirre</u>, 526 U.S. at 424 (quoting <u>Chevron</u>, 467 U.S. at 843).  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  <u>Chevron</u>, 467 U.S. at 842-43.  If, on the other hand, the statute is silent or ambiguous, we turn to <u>Chevron</u>'s second

---

[6]For two different reasons, we have no need to address whether an opinion issued by a single member of the BIA, by virtue of the fact that a single member issued it, is entitled to <u>Chevron</u> deference, <u>see</u>, <u>e.g.</u>, <u>De Leon-Ochoa</u> v. <u>Att'y Gen. of U.S.</u>, 622 F.3d 342, 349-51 (3d Cir. 2010), or is in any event entitled to at least <u>Skidmore</u> deference, <u>see</u> <u>United States</u> v. <u>Mead Corp.</u>, 533 U.S. 218, 227-28 (2001).  First, neither party questions the applicability of the <u>Chevron</u> framework.  Second, the BIA specifically cited to and applied the rule of an en banc BIA opinion, <u>In re Avilez-Nava</u>, 23 I. & N. Dec. at 805-06.

-10-

step and ask "'whether the agency's answer is based on a permissible construction of the statute.'" Aquirre-Aquirre, 526 U.S. at 424 (quoting Chevron, 467 U.S. at 843). In this second inquiry, the BIA's interpretation will be affirmed if it is a reasonable one. See Mead Corp., 533 U.S. at 229 (citing Chevron, 467 U.S. at 842-45).

### a. Chevron's Step One

In this case, the step-one question is as follows: is § 1229b silent or ambiguous as to whether an expedited removal ends an alien's continuous physical presence in the United States?

Vásquez argues that subpart (d)(1), which constitutes the first part of § 1229b(d), unambiguously precludes an expedited removal order, in and of itself, from interrupting an alien's continuous physical presence. Vásquez reasons that subpart (d)(1)'s specificity[7] evinces a congressional intent to create an

---

[7]As stated earlier, subpart (d)(1) explains that continuous physical presence is generally terminated

> (A) . . . when the alien is served a notice to appear under section 1229(a) of this title, or (B) when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien inadmissible to the United States under section 1182(a)(2) of this title or removable from the United States under section 1227(a)(2) or 1227(a)(4) of this title . . . .

§ 1229b(d)(1).

-11-

exhaustive list of events that end continuous physical presence. Vásquez further bolsters his position by asserting that statutes pertaining to removal should be strictly construed in favor of the alien.

We are unpersuaded. Despite its specificity, subpart (d)(1) "does not state that these are the only circumstances in which continuous presence 'shall be deemed to end'." See Mireles-Valdez v. Ashcroft, 349 F.3d 213, 218 (5th Cir. 2003). In fact, nothing in the entirety of § 1229b expressly precludes expedited removal from ending an alien's continuous physical presence. As the Third Circuit has observed, "The statute does not further define 'continuous physical presence,' and it is silent as to whether there are additional circumstances under which continuous physical presence may be broken." Mendez-Reyes, 428 F.3d at 191.

Further, Vásquez's argument ignores the second part of § 1229b(d): subpart (d)(2). Subpart (d)(2) specifies additional circumstances — specifically, departures from the United States that exceed a certain duration — that end continuous physical presence. The existence of subpart (d)(2) precludes any argument that subpart (d)(1) amounts to an exhaustive list of events that interrupt continuous physical presence. Mireles-Valdez, 349 F.3d at 218 ("[S]ubpart (d)(1) cannot be exhaustive because . . . subpart (d)(2) provides that certain absences, on the basis of their length, terminate continuous presence."); see also Tapia v.

-12-

Gonzales, 430 F.3d 997, 1001 (9th Cir. 2005) ("Congress did not explicitly specify when an alien absent for less than ninety days may continue to accrue time toward the continuous physical presence requirement and when the accrual of time is terminated . . . ."). Nor do we see any clear indication that subparts (d)(1) and (d)(2) together were meant to constitute an exclusive list. See Mireles-Valdez, 349 F.3d at 218; Mendez-Reyes, 428 F.3d at 192 ("[T]he fact that Congress has declared [in subpart (d)(2)] that a departure of more than 90 days shall constitute a break in physical presence does not necessarily mean that departures of less than 90 days shall not constitute a break in physical presence."); see also Ascencio-Rodriguez v. Holder, 595 F.3d 105, 112 (2d Cir. 2010) ("[A]lthough 8 U.S.C. § 1229b(d) sets forth circumstances under which continuous physical presence must be deemed to have been broken, Congress has not spoken on whether other events can also operate to terminate an alien's period of continuous physical presence." (internal quotation marks omitted)).

In short, § 1229b(d) does not unambiguously preclude unspecified occurrences, such as an expedited removal, from ending an alien's continuous physical presence in the United States.[8]

---

[8]But see Vasquez-Lopez v. Ashcroft, 343 F.3d 961, 965 (9th Cir. 2003) (Berzon, J., dissenting from order denying rehearing en banc) (in case involving whether voluntary departure under threat of removal broke continuous physical presence, noting that, "I am unconvinced that section 1229b(d)(2) is sufficiently ambiguous on its face to survive the first prong of Chevron").

Consequently, we turn to step two and ask whether the BIA's determination that an expedited removal does in fact interrupt continuous physical presence is a reasonable construction of the statute.

### b. **Chevron's Step Two**

Vásquez argues that, even if this court finds § 1229b ambiguous, "the [BIA]'s interpretation is impermissible given the strict construction that should be given immigration statutes, particularly removal statutes."

Again, we disagree. First, as the Third Circuit has observed, "[i]n light of the INA's enormously broad delegation to the Attorney General, we would be extremely reluctant to hold that his interpretation of the INA is unreasonable." Mendez-Reyes, 428 F.3d at 192 (internal quotation marks omitted) (applying step two); see also Vasquez-Lopez, 343 F.3d at 970 ("We must also be mindful that 'judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations.'" (quoting Aguirre-Aguirre, 526 U.S. at 425)).

Second, an expedited removal order is clearly intended to sever an alien's ties with this country for the five-year period during which it prohibits an alien from re-entering the United States. See § 1182(a)(9)(A)(i); Juarez-Ramos, 485 F.3d at 511.

-14-

Accordingly, it is not unreasonable to conclude that an alien's departure from the United States following such an order constitutes an interruption in that alien's continuous physical presence in the United States. In fact, a contrary rule would seem inconsistent with the congressional intent underlying the INA. See Juarez-Ramos, 485 F.3d at 511 (holding that expedited removal interrupts continuous physical presence "because, in at least one important way, expedited and formal removals are similar. Both carry with them an explicit statutory bar to readmission for a period of five years. This statutory bar reflects a congressional intent to sever an alien's ties to this country." (internal citations omitted)); Tapia, 430 F.3d at 1002 (in distinguishing a border turnaround from a voluntary departure under the threat of removal, noting that, "[t]o permit an alien who was removed or left pursuant to an administrative voluntary departure to continue to accrue physical presence would thwart Congress's clear intent that such an alien be inadmissible for years following the date of his departure").

We are aware that upholding the BIA's decision "might be seen as arbitrarily rewarding those aliens lucky enough to have a border official turn them around without placing them in the expedited removal process." See Juarez-Ramos, 485 F.3d at 512 (internal marks omitted). However, any construction of § 1229b will undoubtedly result in some seemingly arbitrary or unfair

-15-

results,[9] and "a line must be drawn somewhere."  See id.  The BIA was required to interpret the impact of expedited removal, which precludes an alien from returning to the country for five years, on eligibility for cancellation of removal, which authorizes relief for certain aliens who are inadmissible but have continuously lived in the United States for ten years.  We cannot say that the way in which the BIA balanced the goals of these provisions of the INA was unreasonable, and we therefore defer to its construction of the statute.

**B.      Vásquez's Purported Right to be Warned About the Consequences of Expedited Removal**

In addition to his challenge to the BIA's interpretation of § 1229b, Vásquez urges us to remand to the IJ to "determine if he was given the choice of being turned away after warning [sic] that the consequences of an expedited removal would pretermit a cancellation application."  Vásquez contends that "[t]he INA, its implementing regulations as well as a number of circuit and [BIA] decisions indicate that at the border, an applicant for admission to the United States should be warned of the consequences and be

---

[9]For example, even under Vásquez's reading of § 1229b, an alien who leaves the United States and is lucky enough to slip back into the country illegally within ninety days may be eligible for cancellation of relief.  However, an alien who tries to do the same but has the unfortunate luck of getting caught, and is therefore unable to gain entrance within the ninety-day window, is ineligible for such relief.

-16-

allowed to voluntarily withdraw his application for entry and be turned away."

Vásquez did not, however, exhaust this argument in the administrative proceedings below,[10] and we therefore may not consider it.  See, e.g., Silva v. Gonzales, 463 F.3d 68, 72 (1st Cir. 2006) ("[W]e may review a final order of the BIA only if 'the alien has exhausted all administrative remedies available to the alien as of right.'  Under the exhaustion of remedies doctrine, theories insufficiently developed before the BIA may not be raised before this court." (quoting § 1252(d)(1))).

Vásquez attempts to overcome this hurdle with a series of cursory counter arguments.  First, citing United States v. Sosa, 387 F.3d 131, 136-37 (2d Cir. 2004), he asserts that an exception to the exhaustion requirement exists in this case "[g]iven the exclusivity with which the Customs and Border Patrol officials operate," and the fact that Vásquez interacted with them pro se. Second, Vásquez suggests that the exhaustion requirement may be excused here because "[t]his court could . . . determine that the time frame for determinations that [Vásquez] urges are nonexistent."  Finally, Vásquez asserts that any "attempt to raise

---

[10]In his main brief Vásquez contends that "[t]he record does show . . . that the issue was raised before the [IJ]."  In his reply brief, however, Vásquez concedes that he "presents an argument that was not admittedly presented to the [BIA]."

the argument before the [BIA] would have been futile" because "the [BIA] does not hear constitutional issues."

None of these arguments are persuasive. First, this case does not implicate the principles at issue in Sosa, which held that, where a previous deportation order is used as an element of a criminal offense, "[a] failure to exhaust administrative remedies bars collateral review of [that deportation order] under [8 U.S.C. § 1326(d)] . . . only where an alien's waiver of administrative review was knowing and intelligent." Id. As for his nonexistent time frame contention, Vásquez offers nothing more than the above-quoted sentence to support this argument, and we cannot see how this case would satisfy that exception to the exhaustion requirement. Finally, regardless of it merits, Vásquez's last argument fails because Vásquez does not actually advance a developed constitutional claim. Although Vásquez's reply brief asserts that his right-to-a-warning argument is constitutional in character, Vásquez's main brief does not. Other than a few references to "fairness" and "fundamental fairness," the brief never suggests that it is advancing a constitutional theory. In fact, the relevant section of the brief never expressly cites to any constitutional provision. Rather, it relies on citations to the INA, corresponding regulations, and case law analyzing the BIA's interpretation of the INA.

### III. Conclusion

For the foregoing reasons, we deny this petition in part and dismiss it in part.